PEOPLE v BLEVINS

Docket No. 315774. Submitted March 10, 2015, at Detroit. Decided
February 11, 2016, at 9:00 a.m. Leave to appeal sought.

Anton T. Blevins was convicted following a jury trial in the Wayne
Circuit Court of five counts of assault with intent to do great
bodily harm less than murder, MCL 750.84, one count of
second-degree murder, MCL 750.317, and one count of posses-
sion of a firearm during the commission of a felony (felony-
firearm), MCL 750.227b. A group of friends had gone out to
celebrate the college graduation of one member of the group,
Carlos Spearman. They were walking in downtown Detroit
when another member of their group, Zachery Easterly, while
briefly separated from his friends, was confronted by a man he
did not know. The man who confronted Easterly, who was later
identified as Blevins's codefendant, Quintin King, punched
Easterly in the face. Easterly's friends came to his aid while
several other individuals joined King. During the brief confron-
tation between the two groups, King fired several gunshots,
wounding Spearman and killing Courtney "Cortez" Smith. Some
of the men in Spearman's group alleged that they had seen
someone hand the gun to King. The prosecution, relying on an
aiding-and-abetting theory for conviction, alleged that Blevins
gave the gun to King during the confrontation. Defense counsel
argued that while Blevins may have been present at the scene,
he was not involved in the shooting. After he was convicted,
Blevins moved for a new trial. The court, Timothy M. Kenny, J.,
denied the motion. Blevins appealed.

The Court of Appeals *held*:

1. A photographic identification procedure can be so sugges-
tive as to deprive the defendant of due process. The fairness of an
identification procedure is evaluated in light of the totality of the
circumstances, and erroneously admitted identification testi-
mony warrants reversal only when the error is not harmless
beyond a reasonable doubt. In this case, the identification of
Blevins as the person who handed the gun to King was the central
issue. And while other state courts have expounded on the
scientific evidence tending to show that eyewitness testimony is

inherently unreliable, it would require a highly tenuous leap of logic to extrapolate from that evidence that the identification of Blevins by the witnesses in this case was wrong. Blevins had ample opportunity to argue why the witnesses against him should have been deemed unreliable. Any infirmities either were, or could have been, presented to the jury, and the jury was properly instructed to consider these infirmities. Whether or not the photographic lineups could have somehow been conducted better, Blevins failed to establish that the trial court erred when it concluded that they were not unduly suggestive.

2. To constitute ineffective assistance, trial counsel's performance must have fallen below an objective standard of reasonableness, and there must be a reasonable probability that counsel's subpar performance affected the outcome of the proceedings, rendering the proceedings unfair or unreliable. As the trial court concluded in its decision on Blevins's motion for a new trial, defense counsel made strategic and reasonable choices in light of his trial strategy. His cross-examination of witnesses tied into the court's instructions on identification: he impeached witnesses on issues of intoxication, lighting, distance, discrepancies in descriptions, and the amount of time each witness had to make an observation. Although Blevins believes that presenting an expert on eyewitness testimony would have been helpful, the fact that counsel could conceivably have done more does not mean counsel's performance was deficient. With respect to the trial court's instruction regarding identification, seeking an alternative instruction would have been inconsistent with defense counsel's strategy, which tied into the instruction given. In any event, Blevins urged the adoption of an instruction based on authorities not binding in Michigan, and trial counsel is generally not ineffective for failing to make a novel argument.

3. Jury instructions are reviewed as a whole to see if they sufficiently protected a defendant's rights. Even if the instructions were imperfect, there was no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights. Blevins argued that the aiding-and-abetting instruction given to the jury was improper, but the instruction given accurately reflected the law, under which a defendant may be convicted using an aiding-and-abetting theory if the prosecution proves that the defendant aided or abetted the commission of an offense and that the charged offense was a natural and probable consequence of the commission of the intended offense.

4. Blevins asserted that the prosecutor committed misconduct and denied him a fair trial when the prosecutor told the jury that

it could convict him using a team theory of guilt, asked for sympathy for the deceased, argued facts not in evidence, used inflammatory and religious arguments, denigrated defense counsel, and misstated the law. Regarding the team theory of guilt, the prosecutor's references to the way in which all members of a sports team share in the team's victory was obviously a metaphor. The court correctly instructed the jury that Blevins's mere presence at the scene of the crime was insufficient to find him guilty. Regarding Blevins's other assertions of prosecutorial misconduct, Blevins failed to establish any impropriety that deprived him of a fair trial.

5. Evidence is sufficient if, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder. Second-degree murder is first-degree murder minus premeditation and without the perpetration or attempted perpetration of the felonies enumerated in the first-degree murder statute. To aid and abet the commission of a crime, the crime itself must be proved, and the defendant must have rendered some kind of assistance or encouragement to the commission of that crime with the intent that the crime occur or the knowledge that the principal intended for the crime to occur. Blevins contended that because King initially fired into the ground and Spearman was only incidentally injured by a ricochet, Blevins could not have had the requisite intent to cause great bodily harm. Blevins also argued that he did not intend for King to use the gun in the manner he did and, therefore, did not have the requisite intent to be convicted of aiding and abetting second-degree murder. Contrary to Blevins's argument on appeal, it could be reasonably inferred that Blevins's flashing of the gun was a threat of force and that by passing the gun to King upon King's request during the confrontation, which had already become violent, Blevins intended to do at least great bodily harm less than murder to someone in the group. Further, King was convicted of first-degree murder. The passing of the gun unambiguously rendered assistance to the commission of that crime, and indeed was an indispensable part of the crime. The likely inference is that Blevins either knew that King intended to discharge the gun or intended for King to discharge the gun. Consequently, the evidence was sufficient to support Blevins's convictions.

6. When determining whether a new trial may be granted because of newly discovered evidence, the defendant must show: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. In this case, Blevins argued that he was entitled to a new trial because of allegedly newly discovered evidence that someone else had confessed to being the shooter and had indicated that Blevins had not passed him the gun. The trial court found that the fourth requirement, the probability of a different result on retrial, had not been satisfied. The extent to which the proffered evidence was persuasive was matched by the extent to which it was dubious. The witness to the alleged confession testified in the trial court during the hearing on Blevins's motion for a new trial. Thus, the trial court had the opportunity to observe and evaluate the witness's credibility, and the trial court's decision was not outside the range of principled outcomes.

7. The trial court commits plain error when it calculates an offense variable (OV) score using facts beyond those found by the jury or admitted by the defendant if that miscalculation would change the applicable guidelines minimum sentence range. OV 5, MCL 777.35, should be scored at either 15 or zero points depending on whether serious psychological injury to the victim's family may require professional treatment. In this case, the only evidence of psychological injury to the victim's family was presented at sentencing. Consequently, OV 5 should have been scored at zero points, an issue that was preserved by Blevins at sentencing. The reduction of 15 points from Blevins's total OV score, from 105 to 90, would reduce his OV level from III to II. Because second-degree murder, MCL 750.317, is a Class M2 offense against a person, MCL 777.16p, this would reduce his minimum sentence range from 315-525 months to 270-450 months. Improperly calculated sentencing guidelines ranges are reviewed for harmlessness, which necessitated remanding for possible resentencing in accordance with *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

Convictions affirmed; case remanded for further proceedings.

SHAPIRO, J., dissenting, concluded that a new trial was warranted because of errors concerning the eyewitness identification testimony and because the prosecutor's closing argument substantially misstated the legal standard under which the jury could convict Blevins on an aiding-and-abetting theory. The case

against Blevins turned entirely on the eyewitness testimony. The majority correctly observes that the evaluation of a witness's honesty is a question exclusively for the jury. The majority, however, fails to distinguish between the issues of truthfulness and reliability. Unlike truthfulness, questions of reliability turn on factors other than the good faith and subjective honesty of the witness. Scientific developments have often required the modification of evidentiary standards and trial proofs. The core function of evidentiary standards is to enhance the truth-finding process. The consistent finding in the scientific studies of human memory is that, rather than being a single function, memory is made up of multiple, intricate brain operations that govern perception, memory formation, storage, and retrieval. Each of these functions is more complex and subject to far more distortion and error than we previously knew. Memories are vulnerable to distortion, contamination, and falsification at each step. Eyewitnesses encode limited data bits, and then their brains tend to fill in the gaps with whatever else seems plausible under the circumstances. Memories rapidly and continuously decay and may be covertly contaminated by suggestive influence—including by law enforcement officers during interviewing and identification procedures. The overriding principle that has emerged is that memory does not function like a videotape, accurately and thoroughly capturing and reproducing a person, scene, or event, but is instead a constructive, dynamic, and selective process. There are several factors that are not adequately addressed in our present identification jury instruction that are of particular significance with regard to crime scenes. These inadequately addressed factors can lead to a disturbingly high error rate. First, although the stress and fear that accompany crime make it likely that the witness will remember the event, the stress and fear also interfere with the ability to encode reliable details. Second, delays in identification result in higher error rates during later recall. Third, mistaken familiarity may cause the witness to identify as the perpetrator a person who was merely present at the crime scene or who, while not present, was viewed by the witness at a lineup. The risk of misidentification leading to a wrongful conviction is significantly heightened by the fact that our present instruction directs jurors to consider how sure the witness was about the identification when, in fact, studies reveal that witness confidence is only weakly related to the accuracy of identification. Similarly, while the standard jury instruction directs the jury to consider the state of mind of the witness during the recalled event, it offers no guidance as to which states of mind are likely to result in more or less reliable memories. New Jersey has taken

the lead in addressing this problem through revised jury instructions rather than expert testimony, adopting instructions that provide jurors with sufficient guidance so as to allow them to evaluate the reliability of eyewitness identifications with greater accuracy and without the need for expert testimony. The Michigan Supreme Court may wish to direct the Committee on Model Criminal Jury Instructions to undertake the work necessary to allow the Court to refine M Crim JI 7.8 in light of generally accepted scientific principles. Until such a revision occurs, it is incumbent upon defense attorneys, particularly in cases that rest solely on eyewitness identification, to request a special jury instruction or to proffer expert testimony. In this case, the failure to present expert testimony or request a special instruction constituted ineffective assistance of counsel. Further, the prosecutor's opening statement and closing argument substantially distorted the meaning of the law so as to encourage the jury to find guilt not on the basis that Blevins provided the gun to King, but on the basis of guilt by association. The prosecutor repeatedly argued that guilt could be assigned to the entire "team" that stood with King and repeatedly analogized to the fact that every member of a team shares credit for a win or loss, even those who are just sitting on the bench. Given the facts of this case, the standard jury instruction given by the trial court was not sufficient to correct this plain error, and defense counsel's decision to agree with the prosecutor's misstatements of the law rather than to object to them and seek a corrective instruction constituted ineffective assistance of counsel. Judge SHAPIRO would have reversed and remanded for a new trial.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Jon P. Wojtala*, Assistant Prosecuting Attorney, for the people.

*Elizabeth L. Jacobs* for defendant.

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

RONAYNE KRAUSE, P.J. Defendant was convicted by a jury of five counts of assault with intent to do great

bodily harm less than murder, MCL 750.84, one count of second-degree murder, MCL 750.317, and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to 5 to 10 years' imprisonment for each of his assault with intent to do great bodily harm less than murder convictions and to 30 to 60 years' imprisonment for the second-degree murder conviction, all to be served concurrently. The court also imposed a mandatory two-year felony-firearm sentence, to be served consecutively as provided by the felony-firearm statute. Defendant appeals his convictions and sentences. We affirm defendant's convictions but vacate his sentences and remand for resentencing.

The victims in this case were part of a group of friends who went to downtown Detroit to celebrate the graduation of Carlos Spearman. The group consisted of Spearman, Courtney "Cortez" or "Tez" Smith, DeMario Drummond, Philip Knott, Raleigh Ross, Zachery Easterly, Raymond Malone, and Ron Banks. Some of the friends were football players at Wayne State University at the time. Spearman and a few of the others were drinking, but Smith was not drinking and served as the group's designated driver that evening. After being denied access to Club Envy because the bouncer deemed Spearman too intoxicated, the group headed to a Coney Island for him to sober up. On the way, the group encountered some men handing out fliers; one of the friends recalled that among the people handing out fliers was defendant's eventual codefendant, Quintin King.[1]

---

[1] King was found guilty of first-degree murder, six counts of assault with intent to commit murder, and felony-firearm. His convictions are not at issue in the instant appeal.

Also on the way, Easterly decided to relieve himself in an alley in which Courtney's car was parked. Also parked there was another car, and while he was urinating, several people approached Easterly, one of whom expressed concern that Easterly was urinating on the person's car. The friends' recollections of how many people were in the approaching group varied, but several of them identified King, who proceeded to punch Easterly. Several of the friends also identified defendant as a member of the group.[2] The two groups had a brief physical struggle before separating approximately 12 feet from each other.

The two groups exchanged some words, and King said to Ross, " '[W]e got a big fellow here. Here, got something for you.' " Then defendant flashed a gun he had in his pants at the group of friends. Defendant also commanded the group of friends to back up, and they obliged. Malone then heard King say to defendant, " 'Give me the Mag. Give me the Mag.' " Defendant then apparently passed the gun to King. Smith tried to neutralize the fight once the gun was shown. King then fired a shot into the pavement, and the group of friends fled, or attempted to flee, for safety. Spearman was shot in the leg, and Smith was fatally shot through his airway. Ten .45-caliber bullet casings were found at the scene.

During the ensuing homicide investigation, several of the friends were shown multiple photographic lineups, first including King, and later including defendant. In one of the latter arrays, Malone identified defendant as the "guy that handed [King] the gun." Malone told the officer that defendant had said, " 'I advise y'all to step back.' " Malone told the officer that

---

[2] A significant issue at trial and on appeal is whether that identification was accurate.

defendant then lifted up his shirt and flashed the gun.
Malone did not see the gun being passed, but he
assumed it happened because defendant showed the
gun and King shot a gun that looked identical. Ross
was shown a photographic array that included defen-
dant and identified him in the photograph, but Ross
did not see defendant do anything other than be a part
of the group. Knott claimed to have spoken with police
and looked at photographs, but the officer in charge of
the case, Derryck Thomas, did not have a record of
Knott being interviewed because Knott avoided being a
part of the police investigation. There are no facts in
evidence that the police acted improperly or sugges-
tively with the photographic arrays, although defen-
dant contends that it was improper to place him in the
first spot on the photographic arrays that included
him.

Allante Mosley,[3] who was in jail for charges unre-
lated to the instant case, approached officers because
he claimed to have information about a homicide.
Officer Thomas and an ATF agent spoke with Mosley
and concluded that he just wanted help with his
current charges. They remarked that Mosley looked
like King, to the point of being possible brothers or
mistaken for each other. There was never a deal
reached between Mosley and the prosecution. Officer
Thomas saw no value in adding Mosley to a lineup with
King. However, Dequan Todd, who was also in jail
awaiting unrelated charges of which he was eventually
acquitted, shared a cell with Mosley for a month,
during which time Mosley allegedly openly claimed in
the jail ward that he was responsible for " 'the Wayne
State murder.' " Todd later shared a cell with King and
informed King of Mosley's comments. King's lawyer

---

[3] Mosley is also spelled "Moseley" in jail records.

mentioned Todd's potential testimony to defendant's lawyer; however, defendant's lawyer decided that this information did not seem credible and never contacted Todd. However, after defendant was convicted, defendant moved for a new trial, asserting, *inter alia*, that Todd provided newly discovered evidence. The trial court denied the motion.

Defendant first argues that his identification by four witnesses was the product of impermissibly suggestive pretrial procedures that led to an irreparable misidentification. In particular, he argues that the photographic arrays were improper and that an expert witness should have been presented on the topic of eyewitness identification. Defendant argues that eyewitness identification is the least reliable kind of evidence in a criminal conviction, stating that there have been 250 exonerations based on DNA, 76% of which involved misidentification as a factor. Defendant relies on a recent New Jersey Supreme Court holding that discussed problems with identification testimony and a standard for how to judge the reliability of identification testimony. *State v Henderson*, 208 NJ 208; 27 A3d 872 (2011). He also argues that his in-court identification was highly unreliable and likely the product of false memories; for example, he argues, Knott identified him because he was one of the " 'only brothers sitting at the table,' " and this occurred almost two years after the incident. He argues that there was no independent basis for his identification other than unduly suggestive procedures before trial. See *People v McElhaney*, 215 Mich App 269, 286-288; 545 NW2d 18 (1996).

A trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous. Clear error exists when the reviewing court is left

with a definite and firm conviction that a mistake was made. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). Erroneously admitted identification testimony warrants reversal only when the error is not harmless beyond a reasonable doubt. *People v Hampton*, 138 Mich App 235, 239; 361 NW2d 3 (1984). A photographic identification procedure can be so suggestive as to deprive the defendant of due process. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). The fairness of an identification procedure is evaluated in light of the totality of the circumstances. *People v Lee*, 391 Mich 618, 626; 218 NW2d 655 (1974).

Defendant is of course correct in asserting that "identification was the key issue in this case," so we agree that the propriety thereof is highly significant. We are aware that the state of New Jersey has expounded on the scientific evidence tending to show that eyewitness testimony is inherently unreliable. See *Henderson*, 208 NJ at 248-283. However, that case is not binding on this Court. See *People v Jamieson*, 436 Mich 61, 86; 461 NW2d 884 (1990) (opinion by BRICKLEY, J.). More importantly, irrespective of whether eyewitness testimony is unreliable in general, it requires a highly tenuous leap of logic to extrapolate that *defendant's* identification *in particular* must be wrong. Furthermore, because fairness is assessed on the basis of a totality of the circumstances, it is also relevant whether defendant had a meaningful opportunity to argue to the jury why the witnesses should not be believed.

We note that Michigan is not unfamiliar with the concept that human memory and perception are fallible. The standard jury instruction, which the trial court properly gave to the jury, clearly requires the

jury to evaluate how reliable any witness's identification might have been. Defendant had ample opportunity to argue why the *specific* witnesses against him should have been deemed unreliable, including why he believed Knott's identification must be guesswork. We perceive no reason why placing defendant's photograph first in a lineup is inherently suggestive, and in a random assortment the first slot is no less likely than any other. Defendant contends that the lineups were not "double blind,"[4] so the officers conducting the lineup might have subtly or unconsciously suggested a "correct" choice to the witnesses, but this conclusion is pure speculation. The fact that not all witnesses presented identical testimony or even identified defendant is simply normal. Any infirmities either were or could have been presented to the jury, and the jury was properly instructed to consider these infirmities. Whether or not the lineups could have somehow been conducted "better," defendant has not satisfied his burden of establishing that the trial court erred by finding them not unduly suggestive.

Defendant next argues that he received ineffective assistance of counsel because trial counsel did not present an expert witness on eyewitness identification, did not object to Knott's identification of him, and agreed to an erroneous jury instruction regarding identification rather than seeking an instruction based on the New Jersey case, *Henderson*, 208 NJ 208, referred to earlier in this opinion.

---

[4] "Double blind" is a scientific term referring to a manner of conducting a study in which neither the subjects *nor the experimenters* know which of multiple variables is which, generally accomplished by some kind of coding system and logged randomization that can be retrieved after the study is completed. The purpose of double-blind testing is, as defendant points out, to ensure that the experimenters' own perceptions and biases do not unconsciously affect the outcome of the test.

Trial counsel is presumed to have been effective, and defendant must prove otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). We will not substitute our judgment for that of counsel regarding matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). To constitute ineffective assistance, trial counsel's performance must have fallen below an objective standard of reasonableness, and there must be a reasonable probability that counsel's subpar performance affected the outcome of the proceedings, rendering the proceedings unfair or unreliable. *People v Trakhtenberg*, 493 Mich 38, 51, 55-56; 826 NW2d 136 (2012); *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004).

Trial counsel's strategy was to persuade the jury that defendant was merely present at the scene of the crime and that he had no involvement in the shooting. As the lower court found in its decision on defendant's motion for new trial, counsel made strategic and reasonable choices in light of his trial strategy. His cross-examination of witnesses worked with the court's instructions on identification: he impeached witnesses on issues of intoxication, lighting, distance, discrepancies in descriptions, and the amount of time each witness had to make an observation. Although defendant believes that additionally presenting an expert on eyewitness testimony would have been helpful, and defendant may even be right, that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel's performance was deficient. *People v Petri*, 279 Mich App 407, 412-413; 760 NW2d 882 (2008). Accordingly, counsel's decision to rely on cross-examination to impeach the witnesses who identified defendant does not fall below an objective standard of reasonableness.

With respect to the court's instruction regarding identification, seeking an alternative instruction would have been inconsistent with counsel's strategy, which, as already noted, tied into the instruction given. In any event, defendant urges the adoption of an instruction based on authorities not binding in Michigan, and trial counsel is generally not ineffective for failing to make a novel argument. *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996). To the extent defendant argues that counsel could have done better, it is difficult to conceive of a situation in which a trial attorney, reflecting on his or her performance in a trial, could not, with the benefit of hindsight and the luxury of ample time for consideration, find something in his or her performance that he or she could have done better. That, however, is not the standard for assessing whether trial counsel was effective. Trial counsel's strategy was reasonable in light of Michigan law, and the strategy's ultimate failure is simply not relevant.[5]

Defendant next continues his argument in favor of a new and novel jury instruction regarding identification. As noted, the New Jersey Supreme Court found its then-current instructions on identification inadequate in light of scientific advances and a growing understanding of relevant neuroscience. *Henderson*, 208 NJ 208. Defendant also notes that after this decision in New Jersey, the State Bar of Michigan formed a task force to address this issue here. The United States Court of Appeals for the First Circuit has also altered its identification instructions to inform

---

[5] Our dissenting colleague has provided a thorough analysis and summary of the current state of scientific knowledge regarding eyewitness identification, and properly agrees that our present jury instruction regarding eyewitness testimony remains the law. The Court of Appeals is an error-correcting court, and we are unpersuaded that it was erroneous for the trial court or defense counsel to follow the law.

jurors that scientific studies show "the reliability of an identification doesn't really depend upon how positive a person is." *United States v Jones*, 689 F3d 12, 17 (CA 1, 2012). Defendant also argues that the aiding-and-abetting instruction given to the jury was improper because it does not accurately reflect the law or does not apply to all aiding-and-abetting cases. His argument rests on an assertion that the case from which the instruction is derived, *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006), is significantly distinguishable from the matter at bar and itself reflects an exception to the general rule regarding instruction on convicting a defendant under an aiding-and-abetting theory, as decided in the recent United States Supreme Court case *Rosemond v United States*, 572 US ___; 134 S Ct 1240; 188 L Ed 2d 248 (2014).

Claims of instructional error are reviewed de novo. *People v Hall*, 249 Mich App 262, 269; 643 NW2d 253 (2002), remanded in part on other grounds 467 Mich 888 (2002). Jury instructions are reviewed as a whole to see if they sufficiently protected a defendant's rights. *People v Huffman*, 266 Mich App 354, 371-372; 702 NW2d 621 (2005). Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights. *People v Milton*, 257 Mich App 467, 475; 668 NW2d 387 (2003).

We have already discussed why the standard jury instruction regarding identification was appropriate in the instant matter. Defendant distinguishes *Robinson* by asserting that the codefendants in *Robinson* were friends, whereas there was no evidence here that defendant and King even knew each other. We find such an argument unavailing in the face of evidence that defendant *handed King an apparently loaded gun*.

We find it highly unlikely that anyone would simply hand over a gun to a complete stranger during a group confrontation, and even if someone did, it would reflect the most colossal and egregious disregard for the predictable result of that gun being discharged at another person. In *Robinson*, our Supreme Court reiterated that the necessary intent for second-degree murder is "the intent to kill, the intent to inflict great bodily harm, or the willful and wanton disregard for whether death will result." *Robinson*, 475 Mich at 14 (emphasis omitted). The Court held that a defendant may be convicted under an aiding-and-abetting theory if the prosecution proves that the defendant aided or abetted the commission of an offense and "that the charged offense was a natural and probable consequence of the commission of the intended offense." *Id.* at 15. To the extent *Rosemond* held otherwise, it limited its analysis to prosecutions for a particular statutory federal offense, which is of no relevance here. See *Rosemond*, 572 US at ___; 134 S Ct at 1245. The aiding-and-abetting instruction given in this case may have been less than ideal, but we are constrained to follow *Robinson* and therefore cannot find error in the reading of that instruction.

Defendant next argues that the prosecutor committed misconduct and denied him a fair trial when the prosecutor told the jury that it could convict him based on a team theory of guilt, asked for sympathy for the deceased, argued facts not in evidence, used inflammatory and religious arguments, denigrated defense counsel, and misstated the law. A general claim that the defendant was denied his or her due-process right to a fair trial is a claim of nonconstitutional error, and defendant has not asserted that a specific constitutional right was violated. See *People v Blackmon*, 280 Mich App 253, 261-262, 269; 761 NW2d 172 (2008).

Consequently, even if the prosecutor committed an error, we would only reverse if it appears more likely than not that the error was outcome-determinative. *People v Brownridge (On Remand)*, 237 Mich App 210, 216; 602 NW2d 584 (1999).

Defendant argues that the prosecutor not only denied him a fair trial by comparing the aiding-and-abetting theory of criminal culpability to teamwork, but that when coupled with the jury instruction, the burden of proof was shifted to him. We disagree. The prosecutor's references to the way in which all members of a sports team share in the team's victory was obviously a metaphor. Importantly, the trial court clearly instructed the jury that the arguments of counsel were not evidence. Unlike the instruction in *Sandstrom v Montana*, 442 US 510, 512-513, 524; 99 S Ct 2450; 61 L Ed 2d 39 (1979), which impermissibly specified a presumption of intent, the instruction given here explicitly charged the jury with assessing whether defendant had the requisite intent and made clear that defendant could not have been merely present. The prosecutor need not speak in the "blandest of all possible terms." *People v Cowell*, 44 Mich App 623, 628-629; 205 NW2d 600 (1973). We find no error here.

Defendant next argues that the prosecutor impermissibly asked for sympathy for the deceased. While the prosecutor used language that invoked grisly imagery of "transporting this young college student, this Wayne State University football player into a piece of meat sitting on a slab," we do not think that language exceeds the bounds of permissibility. Further, the prosecutor's argument that Knott's lack of cooperation with authorities was because of Knott's perception that "snitches end up in ditches" was a reasonable circum-

stantial inference, one that the jury may have made on its own. See *People v Bahoda*, 448 Mich 261, 282-285; 531 NW2d 659 (1995).

The prosecutor's use of a biblical reference *could* have appealed to a juror's sense of religious duties, but in context, the quotation was merely a somewhat hyperbolic reference to the deceased victim as someone who had attempted to make peace that evening. It was not a reference to any religious beliefs per se, see *People v Jones*, 82 Mich App 510; 267 NW2d 433 (1978), and it did not call upon the jurors to convict on the basis of a religious duty, *People v Rohn*, 98 Mich App 593, 596-597; 296 NW2d 315 (1980), overruled in part on other grounds by *People v Perry*, 460 Mich 55, 64-65; 594 NW2d 477 (1999). There is no impropriety in merely referring to a story from the Bible that the prosecutor may reasonably presume the jurors, irrespective of their individual religious beliefs or affiliations, will likely find familiar. *People v Mischley*, 164 Mich App 478, 482-483; 417 NW2d 537 (1987).

The prosecutor's reference to Mosley, the man who allegedly claimed responsibility for the murder while he was in jail on unrelated charges, as a "red herring" was not improper denigration of defense counsel, but rather a fair argument regarding what the jury should believe. Finally, the prosecutor's statement that "the law permits conviction on adequate identification testimony alone" as long as it "proves beyond a reasonable doubt that the defendant was the person who committed the crime" does not misstate the law. We do not find any misconduct or deprivation of a fair trial.

Defendant next argues that the evidence was insufficient to support his convictions. He concedes that the evidence was sufficient for the jury to find that he displayed the gun, fired it into the ground, and

handed it to King. However, he contends that this evidence is insufficient to prove beyond a reasonable doubt that he aided and abetted second-degree murder.[6] We disagree.

Evidence is sufficient if, when viewed in the light most favorable to the prosecution, "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). Juries, and not appellate courts, see and hear the testimony of witnesses; therefore, we defer to the credibility assessments made by a jury. *People v Palmer*, 392 Mich 370, 376; 220 NW2d 393 (1974). "It is for the trier of fact . . . to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Consequently, we resolve all conflicts in the evidence in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). This Court has defined the intent to do great bodily harm as "an intent to do serious injury of an aggravated nature."

---

[6] Defendant's argument in this regard relies, in part, on his assertion, addressed and rejected earlier in this opinion, that the jury was improperly instructed.

*People v Mitchell*, 149 Mich App 36, 39; 385 NW2d 717 (1986). Second-degree murder is any kind of murder not otherwise specified in the first-degree murder statute. MCL 750.317. It is well established that "second-degree murder is first-degree murder *minus* premeditation" and without the perpetration or attempted perpetration of the felonies enumerated in the first-degree murder statute. *People v Carter*, 395 Mich 434, 437-438; 236 NW2d 500 (1975). To aid and abet the commission of a crime, the crime itself must be proved, and the defendant must have rendered some kind of assistance or encouragement to the commission of that crime with the intent that the crime occur or the knowledge that the principal intended for the crime to occur. *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004); *Carines*, 460 Mich at 757.

Defendant contends that because King fired into the ground and Spearman was only incidentally injured by a ricochet, defendant could not have had the requisite intent to cause great bodily harm. We disagree. It can be reasonably inferred that defendant's flashing of the gun was a threat of force and that by passing the gun to King upon a request during a confrontation that had already become violent that defendant intended to do at least great bodily harm less than murder to someone in the group. Indeed, it is exceedingly difficult to imagine a scenario in which a person who is not being directly threatened or protecting others could make *any* use of a loaded gun on a city sidewalk during a confrontation without, at minimum, a serious disregard for safety. Merely pointing a loaded gun at another person is inherently dangerous; the notion that *actually shooting a gun* in the direction of another person, no matter how inaccurately, could reflect anything but an intent to cause serious harm is beyond comprehension.

We also disagree with defendant's contention that the evidence was insufficient to find him guilty of aiding and abetting second-degree murder. King was convicted of first-degree murder. The passing of the gun unambiguously rendered assistance to the commission of that crime and, indeed, was an indispensable part of the crime. We reject defendant's contention that he was unaware of what King intended to do with the gun or did not intend the gun to be used in the way that King used it. There are a limited number of conceivable reasons why an angry individual presently involved in a violent confrontation might demand that a gun be handed to him, and most of them tend not to end in the gun going unused. There are, likewise, a limited number of conceivable ways in which a loaded gun can be used. The overwhelmingly likely inference is that defendant either knew that King intended to discharge the gun or intended for King to discharge the gun. Consequently, we find that the evidence is sufficient to support defendant's convictions.[7]

Defendant's final argument regarding his convictions is that he is entitled to a new trial on the basis of newly discovered evidence from Todd regarding Mosley's alleged involvement in the crimes. Defendant contends that the evidence provided by Todd will prove the following: (1) Todd met Mosley at the Wayne County Jail, (2) Mosley admitted to Todd that he, not King, killed the football player from Wayne State, (3) Mosley told Todd that defendant was not involved, and (4) Mosley told Todd that defendant never passed Mosley the gun.

"Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence." *People v Grissom*, 492 Mich 296, 312; 821

---

[7] Defendant's felony-firearm charge is derivative of the other charges.

NW2d 50 (2012). This policy is consistent with requiring parties to "use care, diligence, and vigilance in securing and presenting evidence." *Id*. (quotation marks and citations omitted). When determining whether a new trial may be granted because of newly discovered evidence, "a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), quoting *People v Johnson*, 451 Mich 115, 118 n 6; 545 NW2d 637 (1996), and MCR 6.508(D) (quotation marks omitted). The trial court found that the fourth requirement, the probability of a different result on retrial, had not been satisfied; consequently, the trial court impliedly found the other factors satisfied. We review the trial court's findings of fact for clear error, MCR 2.613(C), and its decision for an abuse of discretion, *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998).

We note first that Todd's testimony is to some extent corroborated by an official report that Mosley actually attempted to confess to a murder while in jail. However, it is undermined to an equal extent by the fact that it appears that nothing came of that purported confession. The fact that Mosley made a clear and obvious statement against his own penal interest by stating that he was responsible for " 'the Wayne State Murder' " and was the person who " 'grabbed the gun' " and " 'shot him' " tends to exonerate King, and, to the extent Mosley also stated that defendant was uninvolved, this testimony would also exonerate defendant. Furthermore, Mosley's awareness that the altercation that resulted in the murder began because " 'somebody

pissed on something' " suggests more than casual knowledge of the circumstances of the case. However, again undermining the testimony, Todd said this admission came up because everyone was calling Mosley a snitch in jail because he may have leaked information about the Wayne State murders, but Mosley told them that " 'I can't be a snitch against myself,' " implying that he committed the murders. The circumstances therefore suggest that it was strongly to Mosley's immediate benefit to claim to be a murderer rather than a snitch. We note also that the eyewitnesses were shown photographs of Mosley and denied that he was the shooter, and the jury reviewed photographs of Mosley, defendant, and King.

On its face, the proffered evidence is highly equivocal. Todd testified at the hearing on defendant's motion for a new trial, and the trial court thus had a better opportunity than this Court to observe and evaluate his credibility. See *People v Canter*, 197 Mich App 550, 560-562; 496 NW2d 336 (1992). The clear-error standard does not permit us to attempt to discover a "right" factual finding, but rather obligates us to defer to the trial court unless definitely and firmly convinced it made a mistake. See *Hill v City of Warren*, 276 Mich App 299, 308-309; 740 NW2d 706 (2007). The abuse-of-discretion standard is even more deferential. An abuse of discretion will be found only if the trial court's decision falls outside the range of principled outcomes. *People v Blackston*, 481 Mich 451, 467; 751 NW2d 408 (2008). If we cannot say with confidence that the record discloses a clear mistake or omissions that preclude meaningful review, any doubts we might have flowing solely from the question being close must be resolved in favor of leaving the trial court's decision untouched. See *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881). The extent to which the proffered evidence

is persuasive is matched by the extent to which it is dubious. We are therefore unable to find that the trial court made a clear error or committed an abuse of discretion.

Lastly, defendant argues that the trial court improperly enhanced his sentence by scoring Offense Variable (OV) 5 at 15 points on the basis of facts not found by the jury and that, without the improperly considered evidence, OV 5 should have been scored at zero points. The trial court commits plain error when it calculates an OV score "using facts beyond those found by the jury or admitted by the defendant" if that miscalculation "would change the applicable guidelines minimum sentence range." *People v Lockridge*, 498 Mich 358, 399; 870 NW2d 502 (2015).[8] Defendant preserved this issue in the trial court, a scenario *Lockridge* predicted would be rare. *Id.* at 394. Defendant correctly states that OV 5 should be scored at either 15 or zero points depending on whether "serious psychological injury to the victim's family may require professional treatment," MCL 777.35, and the only evidence thereof was presented by the victim's

---

[8] We are aware that elsewhere in the same opinion, our Supreme Court in *Lockridge* also stated "that trial courts must assess the 'highest number of points possible' to each variable, 'whether using judge-found facts or not.'" *People v Stokes*, 312 Mich App 181, 196; 877 NW2d 752 (2015), quoting *Lockridge*, 498 Mich at 392 & n 28. We find it difficult to reconcile that statement with the holding that the offense variables are to be scored only on the basis of facts necessarily found by the jury or admitted by the defendant. However, we understand that in *Stokes* this Court concluded that it could reconcile the disparate statements in *Lockridge* by determining that judges may score the offense variables on the basis of facts they found independent of the jury and the defendant's admissions on the theory that doing so constitutes a departure, *Stokes*, 312 Mich App at 195-197, which now need only be justified as reasonable, *Lockridge*, 498 Mich at 392. Because we cannot state with confidence that any other interpretation of *Lockridge* is superior, we decline to declare a conflict with *Stokes*.

family at sentencing. Consequently, OV 5 should have been scored at zero points, and the reduction of 15 points from defendant's total OV score, from 105 to 90, reduces his OV level from III to II. Because second-degree murder, MCL 750.317, is a Class M2 offense against a person, MCL 777.16p, this would reduce defendant's minimum sentence range from 315-525 months to 270-450 months. MCL 777.61.

Even though defendant's minimum sentence of 360 months lies within both the scored and the corrected minimum sentence ranges, because the sentence range itself has changed, our Supreme Court's historical interpretation of the sentencing guidelines would constrain us to vacate defendant's sentence and remand for resentencing. *People v Francisco*, 474 Mich 82, 91-92; 711 NW2d 44 (2006). However, in the wake of *Lockridge*, improperly calculated sentencing guidelines ranges are reviewed for harmlessness, which necessitates remanding for possible resentencing in accordance with *United States v Crosby*, 397 F3d 103 (CA 2, 2005), as described in *Lockridge*. See *Stokes*, 312 Mich App at 197-203.

We affirm defendant's convictions, but we remand, consistently with *Crosby*, for possible resentencing. We do not retain jurisdiction.

K. F. KELLY, J., concurred with RONAYNE KRAUSE, P.J.

SHAPIRO, J. (*dissenting*). Late on May 5, 2011, there was a brief but deadly confrontation between two groups of young men in downtown Detroit. As the two groups faced each other, a man from one group fired eight to ten gunshots at the other group. The shots struck two men, killing Courtney "Cortez" Smith and wounding Carlos Spearman.

Following the incident, defendant Anton Blevins and codefendant Quintin King were charged with first-degree premediated murder, MCL 750.316, several counts of assault with intent to murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

The prosecution presented evidence that King fired the shots that killed Smith and wounded Spearman. He was convicted as charged.[1] The charges against Blevins were based on evidence that he initially displayed the gun and then handed it to King. The defense theory put forth by Blevins's counsel was that although Blevins was present, he was not the man who handed the gun to King.

Blevins was convicted of second-degree murder, MCL 750.317, multiple counts of assault with intent to do great bodily harm less than murder, MCL 750.84, and felony-firearm. Blevins raises several issues on appeal. I conclude that a new trial is merited because of errors arising out of the eyewitness identification testimony and because the prosecutor's closing argument substantially misstated the legal standards by which the jury could convict Blevins on an aiding-and-abetting theory.

### I. EYEWITNESS IDENTIFICATION TESTIMONY

It is undisputed that this case turned exclusively on the jury's evaluation of eyewitness identification testimony. There was no forensic evidence linking Blevins to the gun, no evidence of robbery, and no

---

[1] King is not a party to this appeal. A separate panel of this Court affirmed his convictions, but remanded for resentencing in light of *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and MCL 769.25. *People v King*, unpublished opinion per curiam of the Court of Appeals, issued July 23, 2015 (Docket No. 315953).

evidence of any prior bad blood between Blevins and the victims. Although Blevins's attorney conceded that Blevins was among the group of men standing with King, there was no evidence that anyone in the group, other than the man who handed him the gun, did anything to assist King in the crimes. Thus, the question of identification was not whether Blevins was present. Instead, the question was whether Blevins was the man who displayed a gun and then gave it to King before the shooting. I agree with the majority that the evaluation of a witness's honesty is one exclusively for the jury; they, not we, hear and see the witnesses and are in the best position to make such determinations. However, the majority fails to distinguish between the issues of truthfulness and reliability. Unlike truthfulness, questions of reliability turn on factors other than the good faith and subjective honesty of the witness.

### A. PRINCIPLES OF EYEWITNESS IDENTIFICATION

The reliability of eyewitness identifications has generally been understood to turn on external factors, such as those referred to in M Crim JI 7.8, including distance, time of exposure, and lighting. However, in the last several decades, the nature and functioning of memory have become subjects of advanced research and peer-reviewed scientific publications.[2] This research has demonstrated beyond question that the

---

[2] "[O]ver two thousand studies on eyewitness memory have been published in a variety of professional journals over the past 30 years. . . . Even more remarkable is the high degree of consensus that the researchers report in their findings." *State v Henderson*, Report of the Special Master, issued June 18, 2010 (NJ Docket No. A-8-08), p 9, available at <https://www.judiciary.state.nj.us/pressrel/HENDERSON%20FINAL%20 BRIEF%20PDF%20(00621142).PDF> (accessed September 29, 2015) [https://perma.cc/R6L5-XNYZ].

reliability of eyewitness testimony is not limited to external factors or even to individual matters such as the quality of a witness's eyesight. For better or for worse, much of what these studies have revealed is highly inconsistent with our intuition about how memory functions. The studies show that our "common sense" beliefs about memory—i.e., the intuitive presumptions that nearly all jurors (and judges) will bring to bear—are grossly incomplete and often in error. Again, these conclusions are supported by a wealth of scientific studies[3] and have passed muster as admissible under both the *Daubert*[4] and *Frye*[5] tests.[6]

Scientific developments have often required the modification of evidentiary standards and trial proofs. The core function of evidentiary standards is to en-

In addition to the Report of the Special Master, which cites many such studies, a literature review can be found in Note, *State v Henderson: A Model for Admitting Identification Testimony*, 84 U Colo L Rev 1257 (2013), and in Hallisey, *Experts on Eyewitness Testimony in Court—A Short Historical Perspective*, 39 How LJ 237 (1995).

[3] Dr. Colleen Seifert, a professor of cognitive psychology at the University of Michigan who has published extensively in the field, submitted an affidavit in support of Blevins's motion for a new trial. Seifert's affidavit states that there is now a "generally accepted body of scientific research" in this area that is based on the "[*t*]*hree to four hundred peer-reviewed articles . . . published each year* in professional research journals *that demonstrate the social and cognitive factors affecting eyewitness accuracy*," and that the researchers' findings have been "*replicated*" across "*hundreds of studies*" involving the "test[ing of] thousands of individuals" with "*statistically reliable results*." (Emphasis added.)

[4] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[5] *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

[6] For a summary of state and federal law on this issue, see Vallas, *A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses*, 39 Am J Crim L 97, 136-138 (2011).

hance the truth-finding process.[7] When scientific advances allow for a significant increase in the accuracy of that process, the judiciary should investigate and use those advances, rather than merely reiterate its faith in longstanding practices. The development of fingerprint evidence, blood typing, and DNA matching each presented challenges to the conduct of both investigations and trials. While these scientific developments upset preexisting mechanisms of truth-finding, their use was ultimately recognized by the Michigan courts, and we now rely on them as critical mechanisms to enhance the likelihood of conviction of the guilty and acquittal of the innocent. It is now time for the law to take into account what is known about memory formation, storage, and retrieval.

The consistent finding in the scientific studies of human memory is that, rather than being a single function, memory is made up of multiple, intricate brain operations that govern perception, memory formation, storage, and retrieval. Each of these functions is more complex and subject to far more distortion and error than we previously knew.

> *The overriding principle that has emerged is that memory does not function like a videotape, accurately and thoroughly capturing and reproducing a person, scene or event, but is instead a constructive, dynamic and selective process.* Memories must endure the complex processing required for encoding, storage, and retrieval. In the encoding or acquisition stage, the witness perceives an event and enters the information into memory. The storage or

---

[7] "[T]he primary objective of procedural rules should be to facilitate the discovery of truth. . . . [T]ruth must be the goal of any rational procedural system . . . ." Grano, *Implementing the Objectives of Procedural Reform: The Proposed Michigan Rules of Criminal Procedure—Part I*, 32(3) Wayne L Rev 1007, 1011-1012 (1986) (citation omitted).

retention stage is the period between when the memory is
encoded and when the witness attempts to retrieve it. The
retrieval stage represents the witness's attempt to recall
the stored information from memory. Memories are vul-
nerable to distortion, contamination, and falsification at
each step. Eyewitnesses encode limited data bits and then
their brains tend to fill in the gaps with whatever else
seems plausible under the circumstances. Memories rap-
idly and continuously decay and may be covertly contami-
nated by suggestive influence—including by law enforce-
ment officers during interviewing and identification
procedures. [Note, *State v Henderson: A Model for Admit-
ting Eyewitness Identification Testimony*, 84 U Colo L Rev
1257, 1264 (2013) (emphasis added; quotation marks and
citations omitted).]

Contrary to our intuition, neuroscience and cognitive
studies demonstrate that what is stored in a person's
memory can be changed over time, particularly when
there are repeated retrieval attempts as a result of
prompting. The gaps in memory can be filled in with
information that is subjectively experienced as if it
were part of the initial memory of the event.

There are several factors that are not adequately
addressed in our present jury instruction that are of
particular significance with regard to crime scenes.
These inadequately addressed factors can lead to a
disturbingly high error rate. First, although the stress
and fear that accompany these experiences make it
likely that the witness will remember the event, the
stress and fear also serve to "interfere with the ability
to encode reliable details." *Id.* at 1275 (quotation
marks and citation omitted). "[A] *meta-analysis incor-
porating twenty-seven independent studies found
that . . . only 39 percent [of eyewitnesses] made a correct
identification after a high-stress situation." Id.* (empha-
sis added); see also Deffenbacher et al, *A Meta-Analytic
Review of the Effects of High Stress on Eyewitness*

*Memory*, 28 Law & Hum Behav 687 (2004). Second, delays in identification result in higher error rates during later recall. Studies of the decay rate of memory show that 20% of memory quality is lost after two hours, 30% within a day, and 50% within a month. *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo L Rev at 1277. "Longer intervals between the event and identification are associated with fewer correct identifications." *Id.* Third, mistaken familiarity may cause the witness to identify as the perpetrator a person who was merely present at the crime scene or who, while not present, was viewed by the witness at a lineup. *Id.* at 1277-1278.

Unfortunately, our "common sense" belief that identification errors are rare is false. Cognitive studies have demonstrated that identification errors are likely commonplace. "[A] review of published scientific research suggests that *one-third to one-half of eyewitness identifications are simply wrong.*" *Id.* at 1260 (emphasis added). As a result, eyewitness misidentification has been "widely recognized as the single greatest cause of wrongful convictions in this country." *State v Delgado*, 188 NJ 48, 60; 902 A2d 888 (2006). Not surprisingly, therefore, the majority of postconviction DNA exonerations have involved eyewitness misidentifications. *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo L Rev at 1260.

The risk of misidentification leading to a wrongful conviction is significantly heightened by the fact that our present instruction directs jurors to consider "how sure the witness was about the identification . . . ."[8] Indeed, studies have repeatedly demonstrated that the

---

[8] M Crim JI 7.8(3).

degree of certainty expressed by the identifying witness is considered by jurors to be a strong sign of reliability. This belief is common, but it is in error. Studies have repeatedly revealed that "witness confidence is only weakly related to the accuracy of the identifications." Penrod & Cutler, *Eyewitness Expert Testimony and Jury Decisionmaking*, 52(4) Law & Contemp Probs 43, 83 (1989). Thus, although a juror is far more likely to accept the testimony of an eyewitness who states that he or she is "100% certain" of an identification, the likelihood that the identification is accurate is no greater than that of an identification expressed with much less certainty. Put simply, this aspect of the standard jury instruction given in this and nearly all cases is factually erroneous and grossly misdirects the jury.[9]

Similarly, while the standard jury instruction directs the jury to consider the "state of mind" of the witness during the recalled event, it offers no guidance regarding which states of mind are likely to result in more or less reliable memories.[10] How is a juror to know whether a person who is surprised, angry, frightened, or otherwise stressed is more or less likely to accurately perceive, store, and recall information?[11]

---

[9] Greene, *Eyewitness Testimony and the Use of Cautionary Instructions*, 8 U Bridgeport L Rev 15 (1987) (concluding that traditional jury instructions on eyewitness testimony are of minimal effect).

[10] M Crim JI 7.8(3).

[11] In her affidavit in support of Blevins's motion for new trial, Seifert offered this criticism of our present jury instruction:

> While well intentioned, the instructions [do] not provide guidelines to the jurors about how to apply them; for example, what amount of time passing since the incident is likely to lead to correct identification, and what states of mind lead to less accuracy? Further, these instructions do not include warnings about other known biasing factors, such as the presence of a

Advising the jurors simply that they are to consider the witness's state of mind without informing them of the generally accepted research-based knowledge about the objective effect of that state of mind on memory is nothing more than an invitation to jury speculation. We currently leave that to the arguments of counsel, who may each tell the jury their version of what "common sense" dictates and whose attempts at persuasion are not restrained by actual scientific knowledge.[12]

States have taken various approaches to permitting expert testimony about the factors relevant to assessing the reliability of eyewitness identifications. According to a recent article in the American Journal of Criminal Law, the overwhelming majority of state courts and federal circuits allow such testimony at the discretion of the trial judge. Fourteen states and two federal circuits have rules that either encourage or require its admission when eyewitness testimony is the only evidence of guilt. Six states and one federal circuit generally bar such testimony altogether, although one of these states permits it when eyewitness identification is the sole evidence of guilt. Vallas, *A Survey of Federal and State Standards for the Admis-*

---

weapon during the crime, discussion among witnesses about the suspects, and effects of [police] instructions . . . .

[12] We generally do not allow jurors to apply their intuition when there is available scientific evidence to the contrary. For example, in a medical-malpractice case, a plaintiff's lawyer may seek to take advantage of a lay person's intuition that a catastrophic injury resulting from a medical procedure is proof that the procedure was incorrectly performed. We do not shield the jurors from scientific information that shows this "common sense" conclusion to be incorrect. We permit the defense to introduce expert testimony to the contrary and even instruct jurors that an adverse outcome is not, in and of itself, sufficient to show negligence. M Civ JI 30.04. The general principle of reliance on the common sense of jurors is not an excuse to ignore demonstrable scientific data that runs counter to that common sense.

*sion of Expert Testimony on the Reliability of Eyewitnesses,* 39 Am J Crim L 97, 136-138 (2011).

New Jersey has taken the lead in addressing this problem through revised jury instructions rather than expert testimony. In *State v Henderson,* 208 NJ 208, 217-219, 296-299; 27 A3d 872 (2011), the New Jersey Supreme Court appointed a special master to review the relevant scientific literature. After a review of more than 200 published scientific articles submitted by the parties and 10 days of testimony, the special master issued a highly detailed report in which he concluded that the research "abundantly demonstrates the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications." *State v Henderson,* Report of the Special Master, issued June 18, 2010 (NJ Docket No. A-8-08), pp 72-73. The special master further concluded that the traditional mechanisms for considering the reliability of eyewitness testimony "neither recognize[] nor systematically accommodate[] the full range of influences shown by science to bear on the reliability of such testimony." *Id.* at 76.

Following its receipt of the report of the special master, the New Jersey Supreme Court issued its opinion in *Henderson* and later adopted jury instructions intended to provide jurors with sufficient guidance so as to allow them to evaluate the reliability of eyewitness identifications with greater accuracy and without the need for expert testimony. See *Henderson,* 208 NJ at 296-297;[13] New Jersey Judiciary, *Press*

---

[13] The New Jersey Supreme Court ultimately adopted two instructions. One addresses out-of-court identifications, and the other addresses in-

*Release: Supreme Court Releases Eyewitness Identifi-
cation Criteria for Criminal Cases* (July 19, 2012).[14]

There is scant Michigan caselaw concerning this
issue. The sole published case appears to be *People v
Hill*, 84 Mich App 90, 95-97; 269 NW2d 492 (1978), in
which we held that expert testimony regarding eyewit-
ness identification may be proper in some cases and
left the matter to the trial court's discretion.[15] How-
ever, the need to address the reliability of eyewitness
identification has not gone wholly unaddressed. The
Michigan State Bar established the Michigan Eyewit-
ness Identification Task Force,[16] which issued two
reports in 2012: *Prosecutor Eyewitness Identification
Training Guide* and *Law Enforcement and Eyewitness
Identifications: A Policy Writing Guide*. These reports
highlighted that the problem of potential misidentifi-
cation creates the greatest risk of a miscarriage of
justice when "there is minimal or no circumstantial

court identifications. Each informs the jurors that they are to determine
whether the identification is sufficiently reliable. The instructions offer
brief general information about memory and list numerous variables,
indicating whether the presence of those variables tends to increase or
decrease the reliability of an eyewitness identification. See New Jersey
Judiciary, *Revised Eyewitness Identification Jury Instructions* (July 19,
2012), available at <https://www.judiary.state.nj.us/pressrel/2012/
jury_instruction.pdf> (accessed September 30, 2015) [https://perma.cc/
L2YH-GVRZ].

[14] Available at <https://www.judiary.state.nj.us/pressrel/2012/
pr120719a.html> (accessed September 30, 2015) [https://perma.cc/
CQ5E-SVN5].

[15] The *Hill* Court reversed the defendant's conviction and remanded for
a new trial on the basis of a separate challenge to two in-court identifi-
cations and the lower court's failure to conduct a necessary evidentiary
hearing regarding those identifications. *Hill*, 84 Mich App at 92-95.

[16] The task force was co-chaired by Nancy Diehl, former Chief of the
Trial Division of the Wayne County Prosecutor's Office, and Valerie
Newman, a staff attorney with the State Appellate Defender Office.
Members of the task force included four trial judges, two appellate
judges, several prosecutors, and several defense attorneys.

evidence to support a witness or witness's identification in a stranger situation . . . ." State Bar of Michigan, *Prosecutor Eyewitness Identification Training Guide* (2012), p 1 (emphasis omitted). In such a situation, *"extreme caution must be taken due to the possibility of misidentification." Id.* (emphasis added). After listing multiple factors to consider related to identification reliability, the report cites *Henderson* for a "detailed explanation defining each of [the] factors and explaining how they affect reliability." *Id.* at pp 3-4 & n 1. The guide sets forth detailed, step-by-step research-based methods to ensure accurate identifications. *Id.* at pp 1-4. Implementation of these methods, at the point before a prosecution begins, may substantially reduce the number of cases in which the reliability of an eyewitness account is seriously questioned by ensuring that the identifications were initially made under reliable conditions.

Once a trial begins, however, it remains for the jury to perform its truth-finding role. Accordingly, the jury must be reasonably informed of the scientific understanding of how memory functions and what factors research has shown to be indicative of reliability or a lack thereof. The Supreme Court may wish to direct the Committee on Model Criminal Jury Instructions or some other body suited to the task to undertake the work necessary so as to allow the Court to refine M Crim JI 7.8 in light of generally accepted scientific principles. This approach would provide consistency and would avoid the inefficient presentation of expert testimony on a case-by-case basis.[17]

At the present time, however, M Crim JI 7.8 remains as our standard instruction on eyewitness testimony,

---

[17] See generally *United States v Hall*, 165 F3d 1095, 1118-1120 (CA 7, 1999) (Easterbrook, J., concurring).

and until such a revision occurs, it is incumbent upon defense attorneys, particularly in cases that rest solely on eyewitness identification, to request a special jury instruction or to proffer expert testimony.

At the *Ginther*[18] hearing in this case, defense counsel stated that he was generally unaware of the literature on witness identification, that he had not thought there were any issues to be made about the photo arrays, and that he was not familiar with the State Bar's 2012 eyewitness identification policy-writing guide for law enforcement. He stated that he did not consult with an expert nor consider requesting a special or modified instruction on identification.

It is with these issues in mind that we should conduct our review of the eyewitness testimony in this case.

### B. THE EYEWITNESS IDENTIFICATION TESTIMONY

All the witnesses traveled to downtown Detroit to celebrate Spearman's college graduation. In addition to Spearman, the witnesses were: Zachery Easterly, Phillip Knot, Raleigh Ross, DeMario Drummond, and Raymond Malone. Of these six eyewitnesses, two did not recall Blevins being present. Three others identified Blevins as present among the group of six or seven individuals with King, but did not see Blevins pass a gun to King. Two witnesses testified that Blevins gave King a gun. The witnesses' testimony will be summarized seriatim.

### 1. SPEARMAN

Spearman was shot and wounded in the incident. He testified that he never saw the man who shot him,

---

[18] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

and he could not identify Blevins as having passed the gun or even as having been present during the incident.

### 2. EASTERLY

Easterly testified that, except for himself and decedent Smith, all the members of his group had been drinking. He stated that the incident began at about 11:30 p.m. when he walked some distance away from his group and urinated in a parking lot. He said a "[d]ark skin[ned]" black male, whom he identified as King, confronted him about urinating. He said that King and a second man—who was not Blevins—cornered him against a wall. He testified that King punched him in the nose, causing him to bleed profusely. Shortly thereafter, the rest of Easterly's group rejoined him, and, seeing his injury, they started "walking up on" King and a group of four or five men with whom King was standing.

Easterly testified that he was about 25 feet from the men in King's group when he saw a "light skinned" black man take a silver gun out of his waistband and fire one shot at the ground.[19] Easterly testified that he immediately hid behind a car and that he heard additional shots fired, but did not see who fired them. Easterly did not identify Blevins as the man who drew or fired the gun. He did not identify Blevins even as having been present during the incident. He testified that it was "too far back to recall."

Easterly also testified regarding the pretrial identification procedures. He stated that four days after the shooting, the police showed him a photo array made up

---

[19] The other witnesses testified that King fired all the shots, including the one at the ground.

of headshots[20] of six individuals. Though neither Blevins's nor King's photos were in this array, Easterly selected two individuals, both of whom the police determined were not suspects. Two weeks later, Easterly was shown a second photo array of headshots. This array included King, whom Easterly selected as possibly being the shooter. Several weeks later, on June 10, Easterly was shown another array of six headshots. Blevins's photo was in this set, but Easterly did not select it.

### 3. KNOT

Because he did not appear when subpoenaed for the preliminary examination, Knot testified pursuant to subpoena and under the threat of being detained as a material witness. His testimony was inconsistent with that of the others in several respects and, unlike the other witnesses, was challenged on cross-examination on the basis of a lack of credibility.

Knot testified that he had been shown as many as 60 photographs by the police, although the record did not reveal whose photos he was shown or when the photo lineups occurred. He stated that when shown the photos he did not see anyone he recognized from the incident. He testified that thereafter he refused to cooperate with the police investigation.

At trial, nearly two years after the shooting, he identified the two black men sitting at the defense table as the assailants.[21] He testified that King

---

[20] The photos showed the individuals from the neck up.

[21] In *People v Kachar*, 400 Mich 78, 92 n 16; 252 NW2d 807 (1977), our Supreme Court noted the weakness of such testimony:

"Ordinarily, when a witness is asked to *identify* the assailant or thief, or other person who is the subject of his testimony, the

punched Easterly, that King then ran off, and that the groups then confronted each other. He testified that Ross, who was one of several big college football players in Knot's group, began walking toward the other group, and that Blevins pulled out a gun and said, " 'I got something for your big [ass].' " He described the man with the gun as "light-skinned," about "six one," and "skinny," in the range of "190, 185" pounds. Police testimony established, however, that Blevins actually weighed 245 pounds. According to Knot, the man who displayed the gun addressed Smith by his nickname and appeared to know him. He testified, "The guy with the gun was talking to Cortez [Smith], and Cortez was trying to break it up. And he told Cortez, . . . '[Tez], you good, but you know [fuck] them.' " No other witness testified that the man who displayed the gun, or indeed anyone in King's group, called Smith by his nickname or spoke to him at all. Moreover, there was no evidence offered that Blevins and Smith knew each other or had ever met.

Knot testified that King then returned with a gun and began firing, at which point Knot hid and ran. He testified, consistently with his on-scene statement to the police, that he saw two separate guns but that only one was fired.

---

witness's act of pointing out the accused (or other person), then and there in the courtroom is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him. (Emphasis in original.)" 4 Wigmore on Evidence (3d ed, Supp), § 1130, quoted in Comment, *Erroneous Eyewitness Identification at Lineups— The Problem and Its Cure*, 5 U San Fran L Rev 85, 90 (1970) (emphasis in original). *See also United States v Toney*, 440 F2d 590, 592 (CA 6, 1971) (McCree, J., concurring), for discussion of courtroom identification as highly suggestive.

#### 4. ROSS

Ross testified that he had consumed a couple of shots of vodka shortly before the shooting. He recalled hearing Easterly calling out and then finding him bleeding from the nose after being punched. He stated that King's group numbered between six and eight, none of whom he knew previously. He identified Blevins as being in that group. Ross recalled that unfriendly words were exchanged between the two groups. He said he began walking toward the other group, asking why Easterly had been attacked. He heard a man say, "I got something for you," and saw him lift a gun from his waist and point it at him. He testified that the man who spoke and held the gun was *not* Blevins and described the man as approximately 180 pounds.[22]

Ross explained that he backed up, turned around, and immediately heard a shot. He did not think that there was time for the man with the gun to have passed the gun to anyone else. He said he ran and hid behind a dumpster and heard eight to ten gunshots.

Ross testified that he did not see Blevins with a gun, nor did he believe Blevins fired any shots. On June 10, he was shown a photo array that included Blevins. He wrote next to Blevins's photo that he had "seen him at the scene with the group." When asked by the police what he saw Blevins do, he stated "I didn't see him do anything other than stand there[.]"

#### 5. DRUMMOND

Drummond initially testified that he had no alcohol on the evening of the incident. However, after being

---

[22] As already noted, Blevins weighed 245 pounds.

shown his preliminary examination testimony, he conceded that he had consumed a couple of drinks that evening and that "it did slip my mind."

Drummond testified that he saw King punch Easterly after Easterly urinated. He testified that another, lighter-skinned man was with King at that time, but that this second man was not Blevins. Drummond stated that, believing that "they got a fight going on," he punched King's companion and then the four "tussle[d]" for about 30 seconds. Almost immediately after, the two groups stood opposite each other: 7 in his group and 6 or 7 in the other group. He testified that Blevins and King were in the other group. According to Drummond, "[E]verybody in [my] group [was] upset. . . . I think it's about to be a fight." Drummond stated that Smith then began walking toward the other group, trying to get everyone to calm down. Then a man he identified at trial as Blevins pulled out a gun and said something like " 'you don't want this' " or " 'this ain't what y'all want[.]' " Drummond said that when he saw the gun, he froze and put his hands up to show he did not mean to take things any further. However, Ross and Knot kept walking "aggressive, like" toward the other group despite his verbal warning to them that there was a gun. Drummond testified that he saw Blevins hand the gun to King, but said he did not hear any words pass between them. Within a few seconds, King fired one shot at the ground and then a few seconds later, he fired in the direction of Drummond and his friends. Drummond testified that as soon as King fired the first shot, everyone in both groups, including Blevins, began to run. Only King remained in place.

Drummond testified that the police showed him several headshot photo arrays at several different

times. On May 9, he was shown an array in which King
and Blevins were not pictured. He selected one photo-
graph from this group, but the person he selected was
not a suspect. He was shown another array on May 23,
from which he selected two men: King and one other
(not Blevins) as possibly being the shooter. On June 9,
he picked out two other men from an array, neither of
whom became suspects. On June 11, Drummond was
shown yet another array of headshots, and in this one
he identified Blevins from "the night of the shooting"
and wrote that Blevins "pass[ed] the shooter the gun."
At trial Drummond stated that he was "100 percent"
sure that Blevins displayed and passed the gun. He
agreed on cross-examination that on the night of the
shooting, he told the police the man who drew the gun
was "skinny."

### 6. MALONE

Malone testified that he saw King and Easterly get
in a scuffle, but did not see anyone with King at that
time. When he saw King hit Easterly, he and his
friends were "all approaching to go fight," and, as they
did, Blevins, who was in the group with King, "showed
us the gun," and "we all backed up." Malone explained
that by "showed us the gun" he meant that Blevins
"lifted his shirt up to show us." Malone testified that
King then said, "[g]ive me the mag," and shortly
thereafter King started firing. He surmised that
Blevins passed King the gun, but he did not see it
actually being passed. He first identified Blevins in a
June 11 headshot photo array. On cross-examination,
Malone agreed that on the night of the incident he told
the police that the man who displayed the gun was 6
feet 3 inches tall and only 145 to 150 pounds, i.e., 100
pounds less than Blevins's actual weight. He also

agreed that at the preliminary examination he had testified that the gun was a revolver because it had a rotating cylinder, although the gun was, in fact, an automatic. Malone explained that the situation "happened pretty quickly" and that he had seen more than 100 people on the night of the shooting.

### 7. SUMMARY OF TESTIMONY

There were six witnesses to the shooting, several of whom had been drinking. The first four gave testimony that did not implicate Blevins as a shooter or as the person who supplied King with the gun. Spearman remembered nothing. Easterly remembered saying that there were two "light skinned" males in the other group and that the one involved in the fistfight with him was not Blevins. He testified that he could not place Blevins at the scene at all, let alone as the man who passed the gun to King. Knot offered testimony that varied substantially from all the other witnesses. Unlike every other witness, he testified that the man who displayed the gun knew Smith personally and called him by his nickname, that two men had guns at the scene but only one of them fired, and that no gun was passed. Although it had been nearly two years since the incident and he had never before identified Blevins or King, Knot identified them at trial as the men with the guns. He testified that only King fired. Ross testified that Blevins was in the opposing group, but he could not say whether Blevins displayed or passed a gun. Drummond and Malone testified that Blevins was the man who displayed the gun and provided it to King. However, on the night of the shooting, each told the police that the man in question was very skinny, and their initial identifications were based on headshot photos that did not reveal build.

There was no evidence presented from either side regarding the number of photo arrays examined by Malone or whether Malone made any selections from those arrays. Although Drummond had selected several photos of nonsuspects before and after he selected Blevins, he nevertheless told the jury that he was "100 percent positive" that Blevins was the man who passed the gun to King.

### C. GROUNDS FOR REVERSAL AND NEW TRIAL

Given the state of scientific knowledge concerning eyewitness identifications and the factors that increase or lessen their reliability, I would conclude that defense counsel was ineffective in this case. At the *Ginther* hearing, defense counsel agreed that he made no effort to learn about or make use of the available science. He explained that he did not do so because he did not think that jurors convict defendants on the basis of eyewitness identifications, a view that is difficult to square with his testimony that the entire case came down to identification and that the only evidence in this case was that of the eyewitnesses. He also testified that he did not request a modified identification instruction because he had never done so in his 40-year career, which is not surprising given his lack of familiarity with the advances in cognitive science.[23]

Given the facts of this case, I would conclude that counsel's strategy was not reasonable, and that the failure to present expert testimony or request a special instruction constituted ineffective assistance of coun-

---

[23] Defense counsel is a highly regarded and sought-after trial attorney. However, even excellent attorneys make serious errors from time to time, and while there are great benefits to experience, it can sometimes lead to complacency regarding the need to stay abreast of newer developments.

sel.[24] At least in cases in which the evidence of guilt consists exclusively of eyewitness identification testimony, a failure to request a special instruction regarding that evidence or to offer expert testimony describing generally accepted scientific findings about eyewitness memory constitutes ineffective assistance of counsel. It risks conviction of an actually innocent defendant and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings . . . ." *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (quotation marks omitted); see also *People v Carines*, 460 Mich 750, 753; 597 NW2d 130 (1999). Like fingerprint, blood typing, and DNA evidence, eyewitness identification testimony can greatly assist the truth-finding process, but only when a jury understands its scientific basis and its limitations.

For this reason, I would reverse and remand for a new trial. For the same reasons, I respectfully propose that our Supreme Court consider whether and how to revise the relevant jury instructions to embrace the scientific advances concerning eyewitness testimony.

## II. THE ARGUMENTS OF TRIAL COUNSEL

Blevins's appellate brief also asserts that two aspects of the prosecutor's closing argument constituted misconduct, or alternatively, that defense counsel's failure to object constituted ineffective assistance of counsel. I agree that the prosecutor's arguments were

---

[24] Seifert's affidavit states that she reviewed the preliminary examination and trial transcripts, the police reports, and the photographic identification materials. She opined that the methods of identification used in this case involved "factors [that] have each been shown in scientific studies to impair eyewitness accuracy and to affect decision-making by triers of fact."

improper in both respects, but conclude that only one of them rises to the level of error requiring reversal.

### A. MISSTATEMENT OF AIDING-AND-ABETTING LAW

It is well settled that mere presence is insufficient to establish guilt as an aider and abettor. *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992). However, the prosecution's opening statement and closing argument substantially distorted the meaning of the law, so as to encourage the jury to find guilt not on the basis that Blevins provided the gun to King, but on the basis of guilt by association, an argument which was of unique import given the facts of this case.

The prosecution argued, both implicitly and explicitly, that guilt should be assigned on a group or "team" basis, a metaphor particularly powerful in this case given that two groups of young men, one of which contained several members of the Wayne State University football team, lined up against each other. The prosecutor repeatedly argued that guilt could be assigned to the entire "team" that stood with King and repeatedly analogized to the fact that every member of a team shares credit for a win or loss, even those who are just sitting on the bench.

In his opening statement the prosecutor said:

> You'll hear these groups kind of pair off facing each other. Words are exchanged. Some people try to do some peacemaking. But then you'll hear that *in the defendant[s']* *group* a gun is produced. [Emphasis added.]

He continued with this theme by asserting that "all the shots that [were] fired that night were fired by *the defendants' group*." (Emphasis added.) Further, the notion of group liability was again emphasized in the context of the two groups being two opposing teams:

[T]he evidence is going to show you that night they were acting as a team. Unfortunately far more effective than my Michigan Wolverines were last night . . . .

They were together during the confrontation. . . . These groups pair off like rival time. Gun was displayed, not in Mr. Smith's team or anybody of that team but by this other side.

This line of argument was repeatedly emphasized during the prosecution's closing argument. In discussing the concept of aiding and abetting, the prosecutor said, "The Judge has talked to you about aiding and abetting. I'm not going to go over all the instructions with you, but *what I think you need to look at is this whole team [concept] that comes into play*." (Emphasis added.) He went on to say:

[A] football team gets credit for [a] touchdown when the defense recovers the ball in the fumble, in the end zone. Even if we can't see who recovered the ball, may be a dispute between us and our friend as to exactly who got the ball. Everyone on the team from the start[er] to the bench warmer gets the same ring if that team wins the championship. Because every one of them in a larger or smaller way contributed to that championship. Like Bo Schlembecker [sic] said back in 1983, "everything is the team. The team."

Describing what happened after King punched Easterly, the prosecutor argued:

Then [Easterly's] friends come to intervene. Mr. Blevins comes to Mr. King's aid with some other people. The gun is displayed. As the groups pair off, words are exchanged. Smith comes in trying to calm people down. I think Mr. Drummond said he was trying to kind of hold Mr. Ross back. Told you shots are fired at Mr. Smith's group. Mr. Smith is hit dead. Mr. Spearman is left wounded. The defendants flee.

> ·  And even if there are some discrepancies of exactly who
> did what when, there is no doubt that they acted together
> to bring about this deadly mayhem. Teammates. They
> deserve the same credit for the crime.

The prosecutor's words did not merely suggest that the shooter and whoever handed him the gun were a team, but that they were members of a team made up of everyone who stood with them. He argued that the defendants "acted together *as part of* a deadly assaultive team." (Emphasis added.) And when noting the absence of self-defense, the prosecutor again referred to the "group" that committed the crime, stating that "[n]ot at issue is did *those people in the group that killed Mr. Smith* or wounded Mr. Spearman and shot at the others act in some kind of lawful self-defense[.]" (Emphasis added.)

A prosecutor's misstatement of law can necessitate reversal when it deprives the defendant of a fair trial. *People v Matulonis*, 115 Mich App 263, 267-268; 320 NW2d 238 (1982). The comments of the prosecutor would not have been improper in a case in which the primary actor was accompanied only by the individual charged with abetting him. In this case, however, there is a larger group that the prosecutor repeatedly refers to as a unit and suggests that they all "get[] equal credit." They were not mere bystanders in the sense that they just happened to be nearby when someone fired a gun. The evidence demonstrated that they chose to stand with King when the other group approached him. However, there was no evidence that any of them engaged in violence or urged King to do so. Only one member of their "team"—the one who handed the gun to King—took an action that aided King in committing his crime. The evidence of who handed the gun to King was highly contested; but there was no doubt that Blevins was part of King's "team" along with four or

five others. Juror doubts regarding the identification
could easily have been tempered by the knowledge that
even if they could not be sure that Blevins handed King
the gun, they could be sure that he was a member of
the "team" that shares the "credit." Under these cir-
cumstances, I cannot conclude that the standard in-
structions given by the trial court were sufficient to
correct the plain error. Moreover, defense counsel
should have carefully rebutted this argument and
sought a curative instruction specifically to clarify that
even if Blevins was part of the group that stood with
King, he could only be convicted if the jury concluded
that he provided or fired the weapon. He did neither.
Indeed, in his closing argument defense counsel agreed
with the prosecutor's statements when he stated:

> I don't know what to tell you about the team con-
> cept . . . .
>
> The team concept notion of aiding and abetting, all
> that's accurate.

Because the prosecutor's comments went to the
heart of what constitutes criminal conduct, I would
find that that the defense counsel's decision to agree
with the prosecutor's statements rather than to object
to them and seek a corrective instruction constituted
ineffective assistance of counsel.

### B. INVOKING SYMPATHY

The defense also argues that the prosecution's argu-
ment improperly invoked sympathy by repeatedly de-
scribing the victim as a "peacemaker." There was a
factual basis for this description because, in the pros-
ecutor's words, the victim had attempted to get every-
one at the scene to "chill out." Reference to the facts is
not improper, and in and of itself, it represented only a

brief, nonprejudicial reference to the victim's good character. However, in my view, the prosecutor's argument was improper because of the manner in which he addressed this fact.

The prosecutor's argument began with a three-page discourse comparing the victim to renowned peacemakers who had been assassinated. "A prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). "Nor may a prosecutor urge the jury to convict . . . on the basis of its prejudices." *Id*. In this case, the prosecutor compared the victim to Yitzhak Rabin and Anwar Sadat and discussed the Nobel Peace Prize several times. He spoke at length about the murder of Abraham Lincoln and how, as a result of the killing of that peacemaker, "[w]e suffered the consequence for over 100 years." He argued that "in our society peacemakers are considered people that deserve recognition." None of these observations had anything to do with the factual determination that the jury was to make. These statements were clearly intended to heighten emotions and sympathy and, in effect, to lower the prosecution's factual burden of proof. In my view, such comments cannot be cured by a trial judge's standard one-sentence instruction that the jury should not allow sympathy to enter into their decision.

There was no objection to this argument, however, and unlike the prosecutor's "team" references, I do not believe that allowing these comments rose to the level of "plain error," nor that the failure to object constituted ineffective assistance of counsel.

### III. CONCLUSION

I would reverse and remand for a new trial because defense counsel provided ineffective representation on

the issue of eyewitness identification and by failing to
object to the prosecution's closing argument based on
"team" responsibility.